**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MICHAEL PREMINGER,

       Plaintiff,

v.                             Case No. 3:25-cv-772-WWB-MCR

RED ROBIN INTERNATIONAL, INC.,

       Defendant.

_____/

## ORDER

THIS CAUSE is before the Court on Defendant's Opposed Motion to Compel Arbitration and Stay Action (Doc. 19), Plaintiff's Response in Opposition (Doc. 20),[1] and Defendant's Reply (Doc. 29). For the reasons set forth below, Defendant's Motion will be denied.

## I.    BACKGROUND

Plaintiff, Michael Preminger, alleges that Defendant, Red Robin International, Inc. ("**Red Robin**"), sent multiple automated text messages to his cellular telephone after he withdrew his consent to receive such messages. (Doc. 16, ¶¶ 8–13, 18). As a result, Plaintiff filed this case against Defendant alleging violations of the Telephone Consumer Protection Act ("**TCPA**"), 47 U.S.C. § 227, and the Florida Telephone Solicitation Act ("**FTSA**"), Fla. Stat. § 501.059. (*See generally id.*). Defendant argues that by signing up

---

[1] Plaintiff's Response in Opposition fails to comply with this Court's January 13, 2021 Standing Order. In the interests of justice, the Court will consider the filing, but any further failures to comply with all applicable rules and orders of this Court, including the Standing Order, may result in the striking or denial of filings without notice or leave to refile.

for its loyalty program and opting to receive text messages, Plaintiff agreed to submit his claims to binding arbitration.  (*See generally* Doc. 19).

## II.     LEGAL STANDARD

In general, the Federal Arbitration Act ("**FAA**"), 9 U.S.C. § 1 *et seq*., governs the enforceability of arbitration provisions in contracts involving transactions in interstate commerce.  *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1288 (11th Cir. 2005).  "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The FAA embodies a 'liberal federal policy favoring arbitration agreements.'"  *Hill*, 398 F.3d at 1288 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  However, it is well-settled that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quotation omitted).

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  In determining whether to compel arbitration, courts do not weigh the merits of the parties' claims.  *AT & T Techs.*, 475 U.S. at 649. Rather, courts must limit their review to three factors: "(1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitrate was waived."  *Senti v. Sanger Works Factory, Inc.*, No. 6:06-cv-1903-Orl, 2007 WL 1174076,

2

at *2 (M.D. Fla. Apr. 18, 2007).  "[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."  *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quotation omitted).

## III.    DISCUSSION

The basic facts regarding the arbitration agreement in this case are not in dispute. On November 14, 2020, Plaintiff visited Defendant's website and opted to join Defendant's loyalty program—Red Robin Royalty—and to receive SMS messages in connection therewith.  (Doc. 19-1 at 2–4).  When Plaintiff selected the SMS option, the following message appeared:



(*Id.* at 8).  Upon clicking the link for the "Terms and Conditions," the user would be presented with the iRed Robin Royalty® Rewards Terms & Conditions, which included the following relevant provision:

> Please read these Red Robin Royalty® Rewards Terms & Conditions ("Rules") carefully. By participating in this Program, you are signifying that: (i) you have read, accept and agree to be legally bound by and (ii) you agree that Red Robin and its subsidiaries and affiliates may send you Program-related marketing and/or promotional communications.

(*Id.* at 8, 11).  However, following the "SMS Terms & Conditions" link would take the user to the SMS Program Terms and Conditions, which stated, as relevant:

> Please review these Terms and Conditions carefully. They include a binding arbitration clause (see section titled "Arbitration Provision") requiring you and us to arbitrate our claims instead of suing in court.
>
> . . . .
>
> **ARBITRATION PROVISION:**
>
> **Please read this section carefully. It may significantly affect your legal rights, including your right to file a lawsuit in court or to participate in a class action. Using or accessing www.redrobin.com, providing your information, and/or your use of any Red Robin service or product constitutes your acceptance of this Arbitration provision.**
>
> Except for disputes that qualify for small claims court, or suits in court to enjoin infringement or other misuse of intellectual property rights, any dispute or claim (whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory) relating in any way to these Terms and Conditions, your participation in any SMS mobile alert or similar text message-based program, and/or your use of any Red Robin website, app, or any other Red Robin service or product, including Red Robin's promotions or communications, will be resolved on an individual basis in final binding arbitration before a neutral arbitrator, rather than in court.

(*Id.* at 8, 25–26).

Defendant argues that by submitting the form and joining the loyalty program, Plaintiff agreed to submit his claims to binding arbitration.  Plaintiff does not dispute that his claim would fall within the scope of the Arbitration Provision but argues that Defendant has failed to present evidence of his assent to the SMS Terms & Conditions.

"The law recognizes two types of internet agreements: clickwrap agreements and browsewrap agreements."  *Tejon v. Zeus Networks, LLC*, 725 F. Supp. 3d 1351, 1355 (S.D. Fla. 2024).[2]  Clickwrap agreements arise "when a website directs a purchaser to

---

[2] The parties rely on Florida law in their briefing.  Therefore, the Court will apply Florida law in resolving the issues.  *See Sun Life Assurance Co. of Can. v. Imperial*

the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions" and browsewrap agreements arise "when a website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process. The purchaser can complete the transaction without visiting the page containing the terms and conditions." *Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d 1252, 1259 (S.D. Fla. 2021) (quotation omitted).  Courts in this District also recognize hybrid agreements, which are browsewrap agreements that "resemble clickwrap agreements in that they require the user to affirmatively acknowledge the agreement before proceeding with use of the website." *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1303 (M.D. Fla. 2018) (quotation omitted).  Many of the cases analyzing such agreements note that the user is warned that proceeding with the transaction constitutes acceptance of the terms and conditions.  *See id.* at 1304; *Falcon v. TelevisaUnivision Digit., Inc.*, No. 8:23-cv-2340, 2024 WL 1492831, at *3 (M.D. Fla. Mar. 29, 2024); *Adams v. Lashify, Inc.*, 689 F. Supp. 3d 1146, 1151–52 (M.D. Fla. 2023).

Contrary to Defendant's arguments, the SMS Terms & Conditions at issue in this case is a browsewrap agreement.  Although the prompt provides that "By selecting submit, I attest that I am 18 or older and have read the Terms and Conditions," the linked "Terms and Conditions" that the user is agreeing he has read are the iRed Robin Royalty® Rewards Terms & Conditions, which do not include an arbitration provision.  Rather, the

---

*Premium Fin., LLC*, 904 F.3d 1197, 1208 (11th Cir. 2018) ("Under our precedents, a party waives its opportunity to rely on non-forum law where it fails to timely provide—typically in its complaint or the first motion or response when choice-of-law matters—the sources of non-forum law on which it seeks to rely.").

Arbitration Provision is contained within the SMS Terms & Conditions, which is linked to with the following language: "See SMS Terms & Conditions for more information." (Doc. 19-1 at 8). Thus, because the user can join the loyalty program without viewing the relevant terms or indicating that he did so, the relevant agreement is a browsewrap agreement.[3]

"Under Florida law, a browsewrap agreement is enforceable when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *Fridman*, 554 F. Supp. 3d at 1260 (quotation omitted). "In this context, inquiry notice refers to '[n]otice attributed to a person when the information would lead an ordinary prudent person to investigate the matter further.'" *Valiente v. Nexgen Glob., LLC*, No. 23-13308, 2025 WL 3140480, at *1 n.2 (11th Cir. Nov. 10, 2025) (quoting *Inquiry Notice*, Black's Law Dictionary (12th ed. 2025)). "Although this is a case-specific inquiry, courts commonly consider the following factors when analyzing browsewrap agreements: color,

---

[3] The Court also does not find that the SMS Terms & Conditions have been incorporated into the iRed Robin Royalty® Rewards Terms & Conditions by reference. Although the iRed Robin Royalty® Rewards Terms & Conditions make a passing reference to the SMS Terms & Conditions, (*see* Doc. 19-1 at 19–20), nothing in the language of the agreement shows a general intent to be bound by the terms of the collateral document. *See Progressive Care, Inc. v. KeyCentrix, LLC*, No. 22-61093-CIV, 2022 WL 18464811, at *2 (S.D. Fla. Nov. 3, 2022); *see also Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 601–02 (3d Cir. 2020). Defendant has failed to provide any legal argument supporting a finding that the passing reference is sufficient to incorporate the SMS Terms & Conditions under Florida law. (*See* Doc. 19 at 8 n.3); *see also Cousins v. Sch. Bd. of Orange Cnty.*, 687 F. Supp. 3d 1251, 1280 (M.D. Fla. 2023) ("[T]his Court is not obligated to address arguments raised in passing in a footnote or that are perfunctory and underdeveloped."); *Redding v. Coloplast Corp.*, No. 6:19-cv-1857-Orl, 2020 WL 13882977, at *3 (M.D. Fla. Nov. 30, 2020) (noting that "[t]he Court will not address under-developed arguments raised solely in a footnote" and collecting cases). Accordingly, the Court considers the documents to be separate and distinct.

size, positioning, language, and design of the hyperlink and its accompanying text." *Tejon*, 725 F. Supp. 3d at 1355.

There is no evidence or argument that Plaintiff had actual knowledge of the SMS Terms & Conditions.  Thus, the question before the Court is whether the content and context of the enrollment process would have put a reasonably prudent person on notice of the need to investigate further.  As Plaintiff notes, many of the cases that Defendant relies on are looking at hybrid agreements, in which the user was warned that proceeding with the transaction constituted acceptance of the terms and conditions.  Because no such language appears in this case with respect to the relevant agreement, these cases are not persuasive on the issue before this Court.  However, in *Derriman v. Mizzen & Main LLC*, 710 F. Supp. 3d 1129 (M.D. Fla. 2023), *Kravets v. Anthropologie, Inc.*, No. 22-cv-60443, 2022 WL 1978712 (M.D. Fla. June 6, 2022), and *Hawkins v. CMG Media Corp.*, No. 1:22-CV-4462, 2024 WL 559591 (N.D. Ga. Feb. 12, 2024), the courts compelled arbitration under similar circumstances as those presented in this case.  First, in *Darriman*, the court found that a notification that set forth the terms of the messaging agreement and then directed the users to "View Terms & Privacy," without more was "conspicuous enough to give Plaintiff notice" because it contained links to the "Terms" and "Privacy" that were "underlined, indicating that they are hyperlinks" and the links were "prominently placed on top of the (contrasting) dark blue 'GET 15% OFF' button," "directly above the sign-up button," and "set off from the text below it in a box of its own."  710 F. Supp. 3d at 1139–40.

Similarly, in *Kravets*, the court upheld a nearly identical browsewrap agreement that laid out the terms regarding messages and then invited the user to "View Terms &

7

Privacy." 2022 WL 1978712, at *4. Again, the court found that the links were presented in a conspicuous manner, and the overall content of the advertisement made it clear that the plaintiff was entering into an agreement to receive a reward in exchange for enrolling in the text messaging program and was then invited to "view" the terms of that program. *Id.* at *5–6.[4]

Finally, in *Hawkins* the court, relying on Florida law, held that a website stating that "By continuing, [the defendant] will receive ongoing access to the information you share and Facebook will record when [the defendant] accesses it. Learn more about this sharing and the settings you have. [The defendant's] Privacy Policy and Terms." 2024 WL 559591, at *1. Although the website lacked an express acknowledgment that the terms would be binding, the court found they were conspicuous and the website contained sufficient indicators that would put a reasonable user on notice that he was assenting to the terms, including the need to click a continue button and the notice that the user was agreeing to share information and then invited to learn more about that agreement. *Id.* at *4–5.

In turn, Plaintiff directs the Court to *Farsian v. Alphalete Athletics, LLC*, No. 24-61027-CIV, 2025 WL 1591452 (S.D. Fla. Feb. 25, 2025). In *Farsian*, the Magistrate Judge

---

[4] Plaintiff argues that these cases are distinguishable because both courts also discussed and relied on the defendants' use of the double opt-in process, whereby the user was required, via text message, to confirm his subscription. While both courts noted that this process further established that the plaintiff was aware of the legal significance of the transaction, neither court found this would have changed the outcome. *Derriman*, 710 F. Supp. 3d at 1141; *Kravets*, 2022 WL 1978712 at *5–6. Although Defendant has presented evidence in this case that it also utilized a double opt-in process, (*see* Doc. 29-1 at 1–2), the message again referenced the iRed Robin Royalty® Rewards Terms & Conditions, not the SMS Terms & Conditions. Accordingly, it, at best, alerted Plaintiff that he had entered into an agreement with Defendant but failed to direct him to the arbitration provision associated with that agreement.

recommended denying a motion to compel arbitration because, although underlined, the link appeared in the same color font and smaller font size, was located below the submission button, and lacked any explicit statement of agreement, instead "merely invit[ing] the user to view the Terms of Service." *Id.* at *4.

Having reviewed the cases submitted by the parties, and other relevant decisions, the Court agrees that the SMS Terms & Conditions link was sufficiently conspicuous. The link appears directly below the box to opt in to text messages, appears in the same size font, is bright red—compared to the surrounding black text and white background—and explicitly uses the words "terms and conditions." (Doc. 19-1 at 8). The link also appears to be located above the final button to submit the form, although that is not entirely clear from the screenshots provided by Defendant. (*See id.* at 6–8). When clicked, the SMS Terms & Conditions clearly and unmistakably put the viewer on notice that they contain an arbitration provision and the Arbitration Provision is clearly set forth in the text, set off with bold font warning the reader that "[i]t may significantly affect [his] legal rights" and that "[u]sing or accessing www.redrobin.com, providing your information, and/or your use of any Red Robin service or product constitutes your acceptance of this Arbitration provision." (*Id.* at 25–26). Plaintiff does not dispute that the link was conspicuous or that the text of the SMS Terms & Conditions gave clear notice of the arbitration provision.

As Plaintiff notes, there is no language on the submission page that clearly requires the user to acknowledge that he has reviewed the SMS Terms & Conditions or will be bound by the same. Nevertheless, much like the forms in cases cited by Defendant, the language of the website made it clear that Plaintiff was agreeing to sign up for text messages in exchange for rewards. This language would put a reasonably prudent

9

person on notice that he was entering into an agreement with the other party and then a conspicuous link to terms and conditions related to that agreement was provided.  Had the form stopped here and Plaintiff been required to submit, the Court would agree that Plaintiff was on inquiry notice.

However, this case varies greatly from the cases cited by the parties because, unlike those cases, Defendant's website involves two agreements, one containing an arbitration provision and one not.  Although the wording of the two links varies slightly, both use the phrase terms and conditions and appear in red.  But the user is only directed that he is attesting to having read the latter, which does not include an arbitration agreement.  Defendant then follows up with a text message again directing the user to the iRed Robin Royalty® Rewards Terms & Conditions, but not mentioning or directing the user to the SMS Terms & Conditions.  There is nothing on the website to clearly indicate that two distinct agreements, with varying terms, are at issue.  Instead, the website uses nearly identical names for the agreements and only directs the user to attest to having read a single agreement.  Under the circumstances, an ordinary prudent person might not realize that each link directs to a distinct agreement with its own terms.  Rather, a reasonable user could very rationally assume that the terms are merely linked twice in an abundance of caution to inform the user of the legal significance of such terms.  In doing so, a reasonable user may click only one of the two links and may not be informed of the arbitration provision if he selects the wrong link, which would be reasonably likely to happen given the emphasis placed on the link to the iRed Robin Royalty® Rewards Terms & Conditions in comparison to the link to the SMS Terms & Conditions.  *See Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020) (holding that website put user on

sufficient notice where it contained multiple agreements, but all the agreements were listed together and the user had to acknowledge agreement to both); *but cf. id.* at 485 (Tagle, J., dissenting) ("The appearance of links to two different products' terms of use on the sign-in screen, Turbo Terms of Use and TurboTax Terms of Use, is confusing.  More than one terms-of-use link on a sign-in screen by itself is enough to confound a reasonably prudent user."); *Brooks v. IT Works Mktg., Inc.*, No. 1:21-cv-1341, 2022 WL 2079747, at *7 (E.D. Cal. June 9, 2022).  Therefore, having considered the content and context of the website as a whole, the Court finds that a reasonably prudent person would not have been put on inquiry notice regarding the arbitration agreement in this case.[5]

## IV.    CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** that Defendant's Opposed Motion to Compel Arbitration and Stay Action (Doc. 19) is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida on April 6, 2026.

---

[5] The Court notes, however, that if the arbitration provision had been contained within the iRed Robin Royalty® Rewards Terms & Conditions, the Court would likely reach a different conclusion.  While there are still two agreements, which is admittedly confusing, the emphasis placed on the iRed Robin Royalty® Rewards Terms & Conditions both on the website and by the double-opt in process makes it more likely that the user was placed on sufficient inquiry notice with respect to that agreement.  Nevertheless, although the iRed Robin Royalty® Rewards Terms & Conditions contain a choice of venue provision—"You agree to settle any action or dispute related to the Program or these Rules only in the state and federal courts of appropriate jurisdiction located in the State of Colorado," (Doc. 19-1 at 22)—they do not contain an arbitration provision.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record